FORT PITT BRIDGE WORKS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 21205, 21206, 21817. Promulgated November 5, 1931.

*Richard S. Doyle, Esq., Leonard K. Guiler, Esq., Charles D. Hamel, Esq.,* and *Alvin B. Peterson, Esq.,* for the petitioner.

*James L. Backstrom, Esq.,* and *P. A. Sebastian, Esq.,* for the respondent.

634

636

638

OPINION.

MURDOCK: The petitioner assigned a number of errors which were either waived or supported by no evidence. They were not urged and will entitle the petitioner to no relief in this proceeding. The Commissioner has conceded that the statute of limitations bars collection of the deficiencies except for certain items which have been properly credited against the assessments. We have, therefore, made no findings of fact in regard to the statute of limitations and see no reason to discuss the question. The respondent made certain claims, by amendment to his answer, alleging that the deficiency for 1917 should be increased if any income reported in 1918 were transferred to 1917, and that, in case the Board holds that expenditures made for designs and drawings should have been capitalized, there should be added to income for each year certain amounts heretofore allowed as ·deductions representing the cost of the designs and drawings plus an amount for overhead expenses.

The petitioner's principal contention is that its profits taxes should be computed under section 210 of the Revenue Act of 1917 and section 328 of the Revenue Act of 1918. The former section is applicable to 1917 income only where a taxpayer's invested capital can not be satisfactorily determined. Section 327 authorizes special

assessment for the years 1918 and 1919 not only where invested capital can not be determined, but it also provides:

Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in section 328. This subdivision shall not apply to any case (1) in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital * * *.

The petitioner attempts to make the following points in support of this contention:

1. Valuable assets received from a predecessor partnership have not been and can not be considered in computing invested capital.

2. Old designs, drawings and patterns of great value have not been and can not be considered in computing invested capital.

3. Due to an improper accounting system known as the completed-contract method, the reporting of profits has been delayed one year, with a consequent reduction of surplus, but it is now impossible to reconstruct a proper surplus on a proper accrual basis.

4. The bookkeeping system has resulted in certain abnormalities such as (a) the deferring and shifting of income, (b) the inflation of current income caused by an incorrect method in the stock steel account, and (c) inaccuracy in income due to the absence of a proper work in process inventory.

The petitioner claims that it received valuable assets in 1896 from the partnership of Straub and Blickle which have not been considered in computing its invested capital. Good will, contracts, plant leases and equipment are mentioned in this connection. These assets were not turned in for stock or shares and must come into invested capital, if at all, as surplus. But had this young firm any good will? Had the good will, the contracts, the lease, and the equipment any value when turned in? If they had, why can not that value be determined and included in invested capital? Special assessment is not to be applied where the petitioner does not exhaust reasonable means to show its true invested capital. *Edwin M. Knowles China Co.*, 9 B. T. A. 1292. Both partners were witnesses, yet these assets were not shown to have had any value. On the contrary, there is evidence that they had no particular value. Furthermore, if they had value, it must have been translated into profits in the intervening twenty years and thus reflected in invested capital by 1917 through earned surplus under the petitioner's method of accounting.

A great number of old designs, drawings, and patterns were in the possession of the petitioner during the years involved in this proceeding. Each of these had been made for the purpose of some particular contract in years gone by and the cost had been charged to expense. The actual cost of those prepared prior to 1906 can not be accurately determined at this time. The petitioner contends that all or some indeterminable part of these designs, drawings, and patterns were capital assets; they cost approximately $1,100,000; they have suffered little depreciation or obsolescence; and some part of their cost should but now can not be reflected in invested capital.

We do not agree that any part of the cost of these designs, drawings and patterns was ever a proper item to be set up as a capital account in the petitioner's business. The testimony shows that the petitioner referred to and made use of some of these drawings in various ways after the completion of the job for which they were prepared. We do not know how many were thus used or how valuable they were for these purposes, but it is quite apparent that in the petitioner's business the principal use made of each design, drawing, and pattern and the principal value of each was in connection with the job for which it was made. After that, further use was problematical and uncertain and their principal value was exhausted. They should not be carried as an asset at their cost in a proper system of accounting for this business. This is particularly true here where the drawings and patterns had been paid for by the customers.

Every new contract requires the preparation of designs, drawings and sometimes patterns. Materials have to be applied in different ways. The draftsman and the pattern maker must give expression to the peculiarities of the particular job. No set of drawings, no design, and no pattern can be prepared with the idea or assurance of future or continued use in the business after the job is completed for which it was first prepared. At least the evidence indicates the truth of the above statement. The situation is unlike that of a plant turning out a more staple product. Cf. *R. S. Newbold & Son Co.*, 7 B. T. A. 471; *Mesta Machine Co.*, 12 B. T. A. 523. Out of the many thousands of old drawings on hand, the petitioner used only 159 in the three years before us in extending old work. The use of old patterns was even less and they had to be altered for such use as they were put to. In addition to the above, some undisclosed number of the old designs and drawings were used for reference in current work. They no doubt had some value for this purpose. But we can not tell from the record the extent of this use or the value which the drawings had for this purpose except that it was not great in proportion to the value of the drawings incident to the contracts for which they were originally prepared.

The question of whether or not designs, drawings and patterns should be charged to expense or capitalized depends, in each case, upon the nature of the particular business and the use to which they are put in that business. The experience of the company and the judgment of those in charge are important factors. The petitioner's practice creates a reasonable inference that it thought the cost should be charged to expense, it still uses that method, and the Commissioner has approved it. Furthermore, we believe it did quite right in charging the entire cost of these items to expense. *Hall Printing Press Co.*, 2 B. T. A. 119; *Co-operative Foundry Co.*, 2 B. T. A. 888; *American Seating Co.*, 4 B. T. A. 649; *Duquesne Steel Foundry Co.*, 15 B. T. A. 467. The case is distinguishable from such cases as *Northwestern Yeast Co.*, 5 B. T. A. 232, where inability to allocate an expenditure between capital and expense was the ground for special assessment. Here the expense characteristics so predominate and the capital features are so uncertain and relatively unimportant that the whole may be charged to expense with propriety. Cost of patterns and drawings was but a small part of the cost of goods sold in the years before us. The possession of the old drawings was not a substantial income-producing factor. This item does not constitute an abnormality. Furthermore, all similar concerns may have been in the same situation for all we know. Cf. *Coca-Cola Bottling Works of Pittsburgh*, 19 B. T. A. 267.

The accounting system employed by the petitioner is the completed-contract system. It is a modification of a strict accrual method and differs in the one respect that items of income and expense, though recorded in primary accounts when accrued or incurred, are not carried into profit and loss as earnings of the business until the contract to which they relate is completed. A separate account is kept for each contract. Any debit balance in the account represents the investment in the contract and any credit balance represents unearned income until the completion of the contract. A characteristic of this system is that income earned in one accounting period may not be accounted for until a later period. It is peculiarly adapted to a business fulfilling contracts which lap over accounting periods where the ultimate gain or loss can not be accurately determined until the completion of the contract. It may be used even though the contracts call for payment on the basis of a certain price per pound. The contracts need not run for more than a year. The Commissioner's regulations permit its use. It has been approved, for tax purposes, by the courts and by this Board. *In re Harrington*, 1 Fed. (2d) 749; *Mesta Machine Co., supra; James C. Ellis*, 16 B. T. A. 1225; *H. Stanley Bent*, 19 B. T. A. 181; *Harrison v. Heiner*, 28 Fed. (2d) 985; affd., 35 Fed. (2d) 283. Its use is no reason for

special assessment. Furthermore, we do not know what the petitioner's income would amount to on any other basis and without the net income the tax could not be computed under the special assessment sections.

For about 35 years the petitioner has consistently kept its books on this system. Its business has been extensive and successful. Competition has no doubt been keen. The bookeeping system has been advantageous, adequate, and satisfactory to the petitioner. It is still in use. The Commissioner approves of it too. But the petitioner now claims in respect to a short period, when income was large and taxes were exceptionally high, that the system was antiquated, inaccurate, and improper for profits-tax purposes. The principal support for this claim comes from the testimony of an accountant who apparently was employed for the purpose of this case only and first attacked the system. His figures are accurate enough, but we disagree with most of his conclusions, and we think there is some reasonable explanation of certain " defects " which he has sought to prove. For example, according to his testimony, the stock steel account was hopelessly inaccurate and improper from an accounting standpoint; it contained arbitrary adjustments; it was forced to balance; and the average price at which steel was charged out to contracts exceeded the average at which steel was carried in this account, thus inflating income for the current year. He was content merely to disclose these phenomena without attempting any explanation. Averages are frequently puzzling and meaningless. Here apparently, steel was charged to contracts at about the current price as disclosed by recent purchases. Officers of the corporation were present when this witness gave his deposition. The books were there. These intelligent officers were responsible for and familiar with the entries in this account. We have no doubt that they could have explained them. Special assessment is not gained except by a full disclosure of the facts so that it satisfactorily appears that there is an abnormality or that invested capital can not be determined.

Another alleged defect in the accounting system is that it provided no inventory of work in process at the end of the year. This contention seems to conflict with that made above, because without such inventory it is difficult to see how the current income could be inflated by excessive charges to contracts. However, the failure to inventory work in process leads nowhere, since such an inventory is not necessary under the method of accounting employed by the petitioner. The method clearly reflects income without it and hence this is no ground for special assessment.

Considering the petitioner's contentions separately and collectively, we can see therein no cause for applying the special assessment provisions of either act here applicable.

The petitioner contends, in connection with the second issue, that $53,500 of the total of $125,000 mentioned in the contract of July 21, 1917, with the Firestone Company was paid to it in cash in 1917 as damages for breach of the earlier contract and was erroneously reported as income in 1918 instead of in 1917. In 1918, when the contract was completed, $75,748.52 was reported as the profit on the contract. In support of this contention it claims that the original contract was for approximately 3,700 tons of fabricated steel, on which it expected to make a profit of $54,094, or about $15 a ton. Even if these figures were correct, there would be some reduction of the damages on account of the steel delivered under the later contract. But the evidence, although conflicting, shows that the tonnage contracted for originally amounted to only 2,500 tons. Two thousand tons of this were canceled. Five hundred tons were contracted for under the final adjustment contract of July 21, 1917. Furthermore, there is evidence that the estimated profit on the original contract was only $13.60 a ton, or .68 of a cent per pound. Counsel for the petitioner argue that the contract of July 21, 1917, called for only 500 tons of steel. In so doing they overlook the fact that the agreement calls for " all grillage and in addition approximately Five Hundred (500) tons of structural steel." The petitioner's offer of the same date stated, " we will furnish you the fabricated grillage * * * and also an additional tonnage amounting to 500 tons." It also stated that the petitioner would erect the 500 tons for a certain amount, but the Firestone Company was to erect the grillage. Thus, it is clear that two products were contracted for, 500 tons of steel and an undisclosed amount of grillage. We can not tell from the record how much steel or grillage was actually furnished, or the price at which the latter was furnished. The petitioner's offer of July 21, 1917, mentions " fabricated " grillage and " additional " tonnage. These terms may mean that the grillage had already been fabricated before work ceased on the original contract. Perhaps costs incident to the original contract have been carried forward into 1918.

We are satisfied that the " lump sum " of $125,000 should not be divided into $71,500 for 500 tons of steel at 7.15 cents per pound and $53,500 for damages for breach of the prior contract. This leaves nothing for the grillage. The record indicates that damages in some amount were paid under the contract of July 21, 1917, but we can not say that the amount was in excess of $27,200 (2,000 tons at a

profit of $13.60 per ton). It may have been less, depending upon the price of the grillage. This really disposes of the question, for, even if this amount were shifted from 1918 to 1917, the deficiencies would not be wiped out. It does not appear, however, that any amount should be shifted to income of 1917. The contract was for a lump sum. The petitioner's method of bookkeeping and of reporting income treated the contract as a whole. The profit was all accounted for and reported in 1918, when the contract was completed. At the end of 1917 the books showed a credit balance in the contract account of only $21,030.56 and the contract uncompleted. We think that the income as reported should not be disturbed in this connection.

The third issue relates to whether or not a profit of $161,091.29 should be taxed as provided in section 301 (c) of the Revenue Act of 1918. It is conceded that the amount of this profit is correct and that it was properly reported in income for the taxable year 1919. Section 301 is in part as follows:

(c) For the taxable year 1919 and each taxable year thereafter there shall be levied, collected, and paid upon the net income of every corporation which derives in such year a net income of more than $10,000 from any Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive, a tax equal to the sum of the following:

(1) Such a portion of a tax computed at the rates specified in subdivision (a) as the part of the net income attributable to such Government contract or contracts bears to the entire net income. In computing such tax the excess-profits credit and the war-profits credit applicable to the taxable year shall be used.

The contract for the fabrication of material for the construction of 21 hangars was a Government contract made between April 6, 1917, and November 11, 1918. The income eventually realized from furnishing the 16 hangars and certain material was derived in the year 1919 and was more than $10,000. Was it derived from or attributable to the Government contract relating to 21 hangars? This is the only question on this issue. The petitioner contends that the contract for 21 hangars was canceled by the Government through the telegram of November 12, 1918; the orders for the 16 hangars and the miscellaneous material were new contracts distinct from the old and accepted by the petitioner on that basis; therefore, the gain was derived from the latter contracts and is not taxable as provided in the above quoted section. However, it nowhere appears that the petitioner ever agreed to allow the Government to cancel the contract for the 21 hangars or indicated that it would make no claim for damages in case the Government refused to take and pay for the material already fabricated. Considering all of the circumstances, we do not think that the telegram referred to served to

rescind the original contract. See Willston on Contracts, section 1826; *United Transportation & Lighterage Co.* v. *New York & Baltimore Transportation Line,* 185 Fed. 386; *Gillespie* v. *United States,* 47 Ct. Cls. 167. This is true even though the petitioner's letter dated November 14, 1918, acknowledging receipt of the telegram stated: " We will make up a statement of cancellation charges and advise you later." Two days later the petitioner received assurance that the Government did not care to cancel the contract, but merely desired to save additional expense by having all work cease, and the petitioner learned in that same letter that there was great likelihood that the Government could eventually use the hangars. Shortly thereafter, the Government notified the petitioner to ship certain of the material originally fabricated for the 21 hangars, and in less than two months after the armistice it had directed the petitioner to ship 16 hangars and certain miscellaneous material. All of this material was to be shipped from material already fabricated on Order No. 50,263 which was ordered for the construction of 21 hangars " 110 x 160." The price was that originally agreed upon, in other words, the war-contract price. The total length of the 16 hangars finally taken by the Government was greater than the length of 19½ of the hangars originally ordered. Thus, the petitioner failed to deliver the material for less than 1½ hangars, and, so far as we know, this material had never been fabricated. The evidence does not indicate that the orders for the 16 hangars were new contracts separate from the earlier war contract, but, on the contrary, it strongly indicates that the Government, under the war contract, was taking certain fabricated material which it needed and was under obligation to pay for. The material and the price were the same as that provided for in the war contract, so that the source of the gains was in the original war contract. The gain must be regarded as income derived from or attributable to that contract. The petitioner cites *Goss Printing Press Co.,* 11 B. T. A. 365, but we think *A. B. Kirschbaum Co.,* 5 B. T. A. 65; *Kirschbaum* v. *United States,* 52 Fed. (2d) 602; *R. Hoe & Co.,* 7 B. T. A. 1277, affirmed on this issue in 30 Fed. (2d) 630, are cases more in point.

Reviewed by the Board.

> *Judgments of no deficiency and no overpayment will be entered.*

McMahon did not participate in deciding this proceeding after the hearing had in the first instance.